UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

HEATHER SWANN, as Personal
Representative of the Estate of
Joshua Swann,

        Plaintiff,

v.                                                    Case No. 3:23-cv-471-TJC-SJH

MICHELLE COOK, in her official
capacity as the Sheriff of Clay County,
Florida; CEDRIC MCGOWAN;
JOSHUA MAYS; JESSE HOLBERT;
and CHRISTOPHER HANNAH,

        Defendants.

_____

**O R D E R**

Heather Swann, as personal representative of the Estate of Joshua Swann, brings this suit against the Clay County Sheriff Michelle Cook and four of her deputies alleging that their actions led to the death of Swann's 33-year-old brother, Joshua Swann, who died on March 6, 2023 while in the Sheriff's custody at the Clay County Jail. The defendants jointly move for summary judgment (Doc. 65), plaintiff responded (Doc. 81), and defendants replied (Doc. 86). The parties filed voluminous exhibits including the autopsy report, medical records, jail records, witness depositions and declarations, expert reports and depositions, Sheriff's Office policies, procedures, and inspection

reports, video from inside the Clay County jail during the time of Swann's custody and audio interviews the Florida Department of Law Enforcement conducted with jail personnel following Swann's death.    The Court has considered all of this evidence in reaching the following decision.

I.    Standard of Review

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.    Fed. R. Civ. P 56(a).    The Court "view[s] all the evidence and draw[s] all reasonable inferences in the light most favorable [to plaintiff]."    Marbury v. Warden, 936 F.3d 1227, 1232 (11th Cir. 2019) (quotation and citation omitted).

II.    Brief Recitation of Facts[1]

On January 26, 2023, Clay County Sheriff's deputies responded to a call at the Orange Park Medical Center Psychiatric Ward regarding an altercation between Joshua Swann and another patient.    Swann was arrested for battery and brought to the Clay County Jail for booking.    A medical screening at intake reflects a diagnosis of schizophrenia but he was otherwise generally healthy and denied any history of heart disease.    Swann had disciplinary issues at the jail and soon ended up in an isolation cell with mental health watches and, on occasion, suicide protocols.    On multiple occasions while there, Swann either

---

[1] These facts are undisputed except where noted, with all reasonable inferences drawn in plaintiff's favor.

refused or, according to plaintiff, was denied access to, food, water, and medications. Swann is seen on various videos engaging in self-harm including banging his head on a metal sink and on the walls. Plaintiff alleges that deputies repeatedly used excessive force in dealing with Swann. Some of the videos show Swann engaged in altercations with jail personnel in his cell and being forcibly restrained. Jail records show medical personnel visited Swann on multiple occasions. Dr. Gaines Martin (the doctor contracted to provide medical services to inmates at the Clay County Jail) reported that Swann was appropriate in their interactions and Swann was not a candidate for forced medications. Dr. Martin reports he was unaware that Swann was refusing food and water. Video of Swann's isolation cell shows that between March 1 and March 4, Swann drank water on dozens of occasions. <u>See</u> summary log of water consumption (Doc. 64-8). In the March 4 video, Swann is seen walking around his cell. A medical report from that day states Swann's blood pressure was 146/90, his pulse was 135, and he reported that he felt like he was dying. The examining nurse determined he was suffering from anxiety. Swann refused his medications, stating he felt better without them.

Following the evening of March 4, 2023, the video shows Swann laying down in a corner of the cell, moving only his arms, head and hands, with a blanket over his torso and legs. It appears Swann remained in that position for approximately 34 hours straight until the morning of March 6, 2023, when

3

Swann reported to a nurse that he had sensation in his legs but could not move them.   Shortly thereafter, the video shows deputies entering Swann's cell where Swann was talking and moving his head, arms and hands.   A nurse who evaluated Swann found he had an elevated pulse and signs of dehydration. Upon consultation, a nursing supervisor determined Swann should be taken to the hospital for further evaluation.

While waiting with deputies, the video shows Swann accepted a drink and ate an apple and cookies.   Deputies lifted Swann into a wheelchair and brought him to another area to be loaded into a vehicle for transportation to the hospital. When he was lifted, the video shows what deputies stated was blood coming from his penis and falling onto the ground.[2]   The video shows that Swann was alert while in the wheelchair and during the few minutes it took to bring him the transport area.   Once there, deputies put a padded undergarment and pants on Swann and lifted him into the vehicle.   The vehicle departed for the hospital but before even leaving the grounds, Swann apparently became unresponsive and the transport deputy turned back.   Rescue units were summoned while jail personnel performed CPR.   Rescue arrived quickly but could not revive Swann, who was declared dead at 11:58 a.m. on March 6, 2023, 39 days after his January 26 arrest.

---

[2] The medical examiner said Swann had a bladder infection, which would explain the blood in his urine.   See Doc. 64-13 at Tr. 58.

4

The autopsy report revealed Swann had an 80% blockage of his left anterior descending coronary artery, an enlarged heart, and died as a result of an acute myocardial infraction—a heart attack.   The medical examiner testified that the tests and information she had did not uniformly show that Swann was dehydrated but even if he was, she could not say within a reasonable degree of medical certainty that dehydration caused his heart attack.   Doc. 64-13 at Tr. 38-39.   She further testified that other signs of physical trauma, including blunt impacts to Swann's head, torso, and extremities, were unlikely to have contributed to his death (she found rib fractures that were consistent with CPR) and she did not think there was any cause of death other than the heart attack.   Id. at Tr. 39-40, 42-43.

III.    Counts I-VIII

Counts I-IV are excessive force claims under 42 U.S.C. § 1983 against four individual Clay County Sheriff's Office deputies.   Counts V-VIII, also brought under § 1983, are claims against each of these same four deputies for failure to intervene to protect Swann from the excessive force of the other three.

Each of these eight counts incorporates ¶¶ 2, 20, 35, and 37, which allege that the defendants' assault, abuse, failure to provide sustenance and failure to provide medical care resulted in Swann's death.

In these § 1983 claims involving Swann's death, the Court looks to Florida's wrongful death act.   See Sharbaugh v. Beaudry, 267 F. Supp. 3d 1326

(N.D. Fla. 2017) (explaining application of Florida's wrongful death statute to §
1983 claims).   Under Florida's wrongful death statute (Fl Stat. § 768.20), when
claims for personal injury are alleged to have resulted in death, Florida law
"essentially substitutes a statutory wrongful death action for the personal
injury action that otherwise would survive." Niemi v. Brown & Williamson
Tobacco Corp., 862 So. 2d 31, 33 (Fla. 2d DCA 2003).   In other words, when the
personal injury is alleged to have resulted in death, those claims are "subsumed
in the wrongful death claim, and no claim, other than the statutory wrongful
death claim [can] be brought." Mucciolo v. Boca Raton Reg. Hosp., Inc., 824 F.
App'x 639, 644 (11th Cir. 2020) (citing Niemi, 862 So. 2d at 33).[3] See Ortiz v.
Burlein, No. 6:22-cv-1603-RBD-EJK, 2023 WL 11823630, at *3 (M.D. Fla. Nov.
28, 2023) (dismissing conspiracy claim that was alleged to have caused death
as subsumed in action for wrongful death); Groover v. Polk Cnty. Bd. of Cnty.
Comm'rs, 570 F. Supp. 3d 1134, 1153-54 (M.D. Fla. 2021) (granting summary
judgment on negligence and negligent training claims that plaintiff had alleged
ultimately resulted in death); Dempsey v. Ford, No. 5:21cv134-TKW-MJF, 2021
WL 8533034, at *3 (N.D. Fla. Sept. 24, 2021) (dismissing negligent retention
claim as subsumed into a wrongful death claim); Banuchi v. City of Homestead,

_____

[3] The Court relies on unpublished opinions as persuasive authority, not
as binding precedent.   See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th
Cir. 2022).

No. 20-25133-Civ-Scola, 2021 WL 2333265, at *7 (S.D. Fla. June 8, 2021) (holding Florida's wrongful death statute precluded each personal injury claim that alleged conduct resulting in death); see also Sharbaugh, 267 F. Supp. 3d 1326 (granting judgment for prisoner officials on § 1983 claims because Florida's wrongful death statute did not permit recovery); Sullivan v. Nassau Cnty., 3:22-cv-267-MMH-PDB, 2023 WL 2391764, at *3 (M.D. Fla. Mar. 7, 2023) (holding personal representative had to comply with Florida's wrongful death statute for her § 1983 and state law battery claims against sheriff) (citing Sharbaugh).[4]

Plaintiff does not present any contrary argument or authority. Indeed, plaintiff does not address the authorities cited by defendants on this issue and instead seems to misapprehend the point entirely. See, e.g., Response (Doc.

---

[4] In some circumstances, tort claims may be pled in the alternative to a wrongful death claim, such as when the cause of death is unresolved. See, e.g., Niemi, 862 So. 2d at 34 (explaining that a plaintiff is permitted to allege alternative theories when it is not clear what caused the death). But that is not the case here. Through four iterations of her complaint, plaintiff has alleged that the excessive force and inhumane confinement and treatment at the hands of these four deputies resulted in Swann's death. See Docs. 1, 16, 20, 53. See also Dempsey, 2021 WL 8533034, at *3 (rejecting suggestion that negligent retention claim could be deemed to be pled in the alternative until cause of death was resolved where a fair reading of the complaint showed plaintiff was alleging that death was caused by the inadequate care of the nurse who plaintiff alleged should have been fired); Groover, 570 F. Supp. 3d at 1154 (determining the alternative theories for relief in the operative complaint could not go forward where plaintiff alleged that the personal injury underlying the tort claims was the cause of death).

81) at numbered paragraphs 2 and 3 (stating, without citation to any authority, that the claims against the officers do not hinge on whether their actions caused Swann's death, and contending that a jury could find their actions in fact did cause his death). Thus, plaintiff's § 1983 excessive force and failure to intervene claims, pleaded without regard to the requirements of Florida's wrongful death statute, are not viable. The defendant deputies are entitled to summary judgment on Counts I-VIII.

IV.    Counts IX-XII

Counts IX-XII are state law intentional tort claims against the same four deputies for assault, battery, intentional infliction of emotional distress, and wrongful death. For the reasons explained above, the assault, battery, and intentional infliction of emotional distress components of Counts IX-XII are subsumed in the wrongful death claim and need not be addressed further. See also Anderson v. Fla. Mem. Univ., Inc., No. 1:21-cv-24014-DPG, 2022 WL 19402479, at *3 (Oct. 4, 2022) (holding Florida's wrongful death statute barred IIED claim that alleged severe mental deterioration and eventual suicide were a result of defendant's actions).

As for the wrongful death claim, Florida law requires that plaintiff prove that "but for" defendants' actions, Swann "more likely than not" would have survived. Acosta v. Miami-Dade Cnty., 97 F.4th 1233, 1242 (11th Cir. 2024); Tappan v. Fla. Med. Ctr., Inc., 488 So. 2d 630, 631 (Fla. 4th DCA 1986)

8

("Florida's Wrongful Death Act [applies] traditional causation principles, which require proof of the 'but-for' test").   It is not enough to show what "may" have happened if different actions had been taken; plaintiff must show that it is more likely than not that the actions of these four deputies (or any one of them) contributed to Swann's death.   Scott v. City of Blountstown, No. 4:16cv438-RH/CAS, 2017 WL 4948070, at *2 (N.D. Fla. July 18, 2017) (granting summary judgment where, had defendants more fully or promptly responded to medical issue, it "may" have affected outcome).

The medical examiner determined that Swann died from a heart attack caused by cardiovascular disease.   She further testified that signs of physical trauma were unlikely to have contributed to Swann's death.   And while she agreed that the nurse noted signs of extreme dehydration in Swann, based on the toxicology report, the medical examiner could not say within a reasonable degree of medical probability that dehydration caused Swann's heart attack.[5] Plaintiff's expert Dr. Brian Swirsky opined that Swann's heart attack was caused by severe or extreme dehydration; that Swann could have avoided death if a nurse had correctly interpreted Swann's heart rate and encouraged oral fluids; that having Swann await transport in a seated position instead of being

---

[5] The Court will presume that plaintiff was not intentionally attempting to mislead the Court by misstating the medical examiner's testimony on this point.   See Response (Doc. 81) at 5, ¶ 7.

prone precipitated the cardiac arrest.[6]

But the four deputies named in the wrongful death counts were not involved in any medical decisions regarding Swann and the last documented use of force against Swann occurred days earlier, on February 28. Nor has plaintiff cited to evidence suggesting that these four deputies in particular were denying Swann access to food or water; the jail incident logs where deputies record meal refusals (Doc. 64-5) rarely include any of their names. Three of the deputies were not working on the day Swann died and the other (McGowan) was working in another part of the jail until he arrived to provide security for medical personnel entering Swann's cell. The video from Swann's cell shows that on the day of his death, Swann was turning his head, speaking, drinking, and eating, and two days before that, he was walking around his cell drinking

---

[6] Defendants have moved to exclude Dr. Swirsky's report as untimely and under Daubert. Although plaintiff claims dehydration was a cause of Swann's death, she has not directly relied on Dr. Swirsky's opinion in her response to the summary judgment motion. The Court need not decide the motions to strike Dr. Swirsky's testimony to resolve the summary judgment motion and includes Dr. Swirsky's opinions here to ensure plaintiff is given every appropriate benefit of the doubt.

Plaintiff's corrections expert, Joseph Gunja (who is not a doctor and is the subject of another Daubert motion based in large part on the numerous misstatements of fact contained in his report), opined (incorrectly) that Swann was found dead in his cell on March 6, and died as the result of a skull fracture caused by a beating. See Doc. 67. Plaintiff (wisely) does not rely on Gunja in her response to the summary judgment motion and the Court need not decide this Daubert motion either.

water.[7]    Plaintiff has not marshaled evidence to show that but for the actions of any of the four deputies, Swann more likely than not would have survived. They are each entitled to summary judgment on the wrongful death claim.

There was no evidence that any potential excessive force caused Swann's death.    To the extent there was any evidence that dehydration or lack of food or medication could have contributed to his death, there is no evidence that any of the four deputies were responsible.[8]    The defendant deputies are entitled to summary judgment on Counts IX-XII.

V.    Count XIII

Count XIII is brought against the Sheriff under § 1983, alleging that the Sheriff's policies and customs allow unconstitutional practices to occur, including regular use of excessive force and the routine failure of staff to provide humane detention conditions including adequate food, water and medical care. For each of these (excessive force, conditions of confinement, and medical

---

[7] Two jail inmates who were deposed both said they could see inside Swann's jail cell at all times but neither provided testimony that could contradict the video inside the cell on March 6, 2023.    See Brooks v. Miller, 78 F.4th 1267, 1278 (11th Cir. 2023) (directing courts to disregard testimony that is "completely and clearly contradict[ed]" by a valid recording); see also Mize v. Jefferson City Bd. of Ed., 93 F.3d 739, 743 (11th Cir. 1996) ("A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'") (quotation and citation omitted).

[8] Plaintiff chose not to sue any of the medical providers.

treatment), plaintiff must prove not only that a constitutional deprivation occurred but that officials acted with deliberate indifference to the deprivation. But even if proven, the Sheriff herself (who is not alleged to have taken any part in these events) cannot be held liable under a theory of respondeat superior. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-95 (1978); Craig v. Floyd Cnty., Ga., 643 F.3d 1306, 1310 (11th Cir. 2011).   Instead, plaintiff "must prove that [the Sheriff] had a 'policy or custom' of deliberate indifference that led to the violation[s] of [Swann's] constitutional rights."   Craig, 643 F.3d at 1310 (citing Monell, 436 U.S. at 694). Because a sheriff is not likely to have an official policy that endorses a constitutional violation (and plaintiff has not identified such an official policy here), plaintiff must show the Sheriff "had a custom or practice of permitting it and that [her] custom or practice was the moving force behind the constitutional violation."   Id. (citation omitted).   But "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability against [the Sheriff]."   Id. (citation omitted).   This holds true even when the incident involves several employees of the Sheriff over time.   Id. at 1311 (affirming summary judgment for County where plaintiff's only proof of unconstitutional custom was the alleged failure of nine different medical providers to refer him for further treatment over the course of nine days and sixteen evaluations); see also Johns v. Broward Cnty. Sheriff, No. 24-10172, 2024 WL 3984062 (11th Cir. 2024) (affirming dismissal of § 1983 claim against sheriff where plaintiff's

repeated complaints over several months that ankle monitor was so tight it impeded his ability to walk were ignored).   Thus, in the absence of an actual policy that endorses unconstitutional conduct (or an act or decision of an official with final policymaking authority), plaintiff must demonstrate "a series of constitutional violations from which deliberate indifference can be inferred," such as a "pattern of similar constitutional violations."   Craig, 643 F.3d at 1310-11.

Although plaintiff's complaint alleges that the Sheriff "has been alerted to the regular use of excessive force" and the "routine failure" of her officers to meet constitutional standards with regard to conditions of confinement and medical care (Doc. 53 at ¶ 151), plaintiff put forward no evidence to support these allegations.   See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (holding that to defeat summary judgment, the non-moving party must "go beyond the pleadings" to point to evidence in the record that demonstrates "specific facts showing that there is a genuine issue for trial").   Even assuming arguendo a constitutional violation, the only evidence plaintiff has adduced regarding a custom and policy is that jail employees, including the four defendant deputies, said they acted in accordance with the Sheriff's policies. But this broad-brush statement fails to identify any custom or policy that would result in a constitutional violation and, in essence, improperly seeks to hold the Sheriff liable under a theory of respondeat superior.

The Sheriff is entitled to summary judgment on Count XIII.

VI.     Other Motions

As noted above, the Court did not need to rule on the admissibility of plaintiff's experts to decide the summary judgment motion and the Daubert motions will be denied as moot, as will plaintiff's motion for extensions of time to respond to those motions, as well as the motion to exclude an expert on grounds of untimeliness.   Plaintiff also moved for an extension of time to secure a new psychiatric expert after a falling out with her retained expert, and alternatively, for leave to dismiss her complaint without prejudice so she could file a new complaint after securing a new psychiatry expert.   Defendants strenuously objected on grounds of prejudice and, at the point plaintiff filed that motion, discovery had closed long before and plaintiff had already responded to the pending motion for summary judgment, never suggesting that she needed this new expert to adequately respond.   Plaintiff's motion for an extension to secure a new expert or for leave to dismiss is due to be denied.   The parties' motions related to mediation (which unfortunately never occurred) will be terminated.

VII.     Conclusion

Mr. Swann was taken to the Clay County Jail because he assaulted another patient in a psychiatric facility.   He was suffering from a significant mental heath crisis, one which the Clay County Jail was challenged to meet.

14

He then died of a heart attack, unexpected for a person in their 30's. That was both sad and unfortunate. However, the personal representative of Mr. Swann's estate, through counsel, was simply unable to adduce viable evidence that the four defendant deputies caused or contributed to his death. Likewise, plaintiff could not manufacture an issue of fact that the Sheriff maintained any policy or custom that was actionable. Therefore, the Court must enter summary judgment for defendants on all counts.

Accordingly, it is hereby

**ORDERED**:

1.    Defendants' Motion for Summary Judgment (Doc. 65) is **GRANTED**.

2.    Defendants' Motions to Strike Experts (Docs. 60, 66, 67, 68) and plaintiff's motion for extension of time to respond to three of those motions (Doc. 87) are **DENIED as moot**.

3.    The motions related to mediation (Docs. 72, 73) are **TERMINATED**.

4.    Plaintiff's Motion for Extension of Time to Complete Discovery for Purposes of Retaining and Disclosing an Expert Witness and Alternative Motion to Voluntarily Dismiss Without Prejudice (Doc. 88) is **DENIED**.

5.    The Clerk shall enter judgment in favor of defendants and against plaintiff on all counts and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 24th day of September, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

s.
Copies:
Counsel of record